UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEITH ADAM LORD, #476505,

    Petitioner,

    v.

BLAINE LAFLER,

    Respondent.
    _____/

CASE NO. 5:06-CV-13642
JUDGE THOMAS L. LUDINGTON
MAGISTRATE JUDGE PAUL J. KOMIVES

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.    RECOMMENDATION ...................................................................................................2
II.   REPORT .........................................................................................................................2
    A.   *Procedural History*........................................................................................2
    B.   *Factual Background Underlying Petitioner's Conviction*............................3
    C.   *Standard of Review*......................................................................................9
    D.   *Sufficiency of the Evidence (Claim I)*........................................................11
        1.    *Clearly Established Law*................................................................12
        2.    *Analysis*..........................................................................................13
    E.   *Admission of Coconspirator Statements (Claim II)*....................................14
        1.    *Clearly Established Law*................................................................14
        2.    *Analysis*..........................................................................................15
    F.   *Conclusion*..................................................................................................17
III.  NOTICE TO PARTIES REGARDING OBJECTIONS......................................................17

1

I.  RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II. REPORT:

A.  *Procedural History*

1.  Petitioner Keith Adam Lord is a state prisoner, currently confined at the St. Louis Correctional Facility in St. Louis, Michigan.

2.  On October 22, 2003, petitioner was convicted of premeditated and felony murder in violation of Mich. Comp. Laws § 750.316, conspiracy to commit first-degree murder in violation of Mich. Comp. Laws § 750.157(a) and Possession of a Firearm During the Commission of a Felony in violation of Mich. Comp. Laws § 750.227(b), following a jury trial in the Calhoun Circuit Court. On November 24, 2003, he was sentenced to life imprisonment for the conspiracy conviction, a concurrent term of life for the murder conviction, plus two consecutive years for the felony firearm conviction.

3.  Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

    I.  WHETHER DEFENDANT'S CONVICTION SHOULD BE REVERSED BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO FIND FOR THE CONVICTION OF CONSPIRACY.

    II. WHETHER DEFENDANT IS ENTITLED TO A NEW TRIAL WHERE THE TRIAL COURT ERRED IN THE ADMISSION OF STATEMENTS MADE BY TWO (2) ALLEGED CO-CONSPIRATORS.

The court of appeals found no merit to petitioner's claims, and affirmed his conviction and sentence. *See People v. Lord*, No. 252847, 2005 WL 1632533 (Mich. Ct. App. July 12, 2005) (per curiam).

4.  Petitioner, proceeding *pro se*, sought leave to appeal these two issues to the Michigan

Supreme Court. The Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Lord*, 474 Mich. 941, 706 N.W.2d 21 (2005).

   5.  Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on August 15, 2006. As grounds for the writ of habeas corpus, he raises the same two claims that he previously raised in the state courts.

   6.  Respondent filed his answer on February 22, 2007. He contends that petitioner's claims are without merit or are procedurally defaulted..

B. *Factual Background Underlying Petitioner's Conviction*

  The evidence adduced at trial was accurately summarized in the prosecution's brief on appeal in the Michigan Court of Appeals:

> Defendant explained the relationships between the parties involved in this case. Defendant's sister is Rachel Talbert. Rachel Talbert is married to the victim's son, who was in prison. Cathy Anderson is cousin to Defendant and Rachel Talbert. (TV 6). Mr. Talbert lived at 318 Parish Street in Battle Creek. The victim's niece, Alice Hart, testified that her Uncle Jerry lived at this address with his daughter-in-law, Rachel Talbert. No one else was supposed to be living there, but Ms. Hart was aware that Cathy Anderson, stayed at her uncle's house often. (TI 205). Ms. Hart met Defendant once, toward the end of November or early December, in her uncle's kitchen.
>
> After her aunt died, Ms. Hart helped Jerry Talbert since he had a few strokes and problems associated with testicular cancer and emphysema. One of the errands Ms. Hart assisted with was taking her uncle to the bank and to his attorney's office to settle some property matters after the death of Ms. Hart's aunt. (TI 206-207).
>
> Mr. Talbert carried approximately $300.00 on his person before his wife died, then about $500.00 afterwards since he did not know when he would get to the bank next. He always had money on him. He was unable to drive, wearing a leg brace and relied on a walker. Mr. Talbert kept the money in his wallet, in a bag, strapped to his walker, or in his front pocket when he did not have the walker. (TI 209, 211). Mr. Talbert normally carried quite a few items in his bag, including inhalers, papers, bills and deeds on recent deals he made. (TI 210). Mr. Talbert frequently bought property in the area and was in the process of selling a number of properties before his death. (TI 212). Ms. Hart identified her aunt and uncle's car, (PX 4Q), which Rachel Talbert drove before Mr Talbert's murder. (TI 212).
>
> Lois Coger knew Defendant for over twenty years. (TI 160). Ms. Coger also

3

knew the victim, Jerry Talbert. (TI 161). Ms. Coger had not seen Defendant for almost ten years until September, 2002, when she saw him again. (TI 162). Ms. Coger saw Defendant thirty to forty times between September and December, 2002. Defendant talked about wanting to kill Jerry Talbert whom he said molested his niece. (TI 167). Defendant's sister, Rachel Talbert and his cousin, Cathy Anderson routinely came with Defendant. (TI 163, 165). Rachel Talbert and Cathy Anderson lived with Jerry Talbert, in one of his two homes. (TI 168). Rachel Talbert routinely drove Jerry Talbert's car. (TI 170).

During the first week of September, after Defendant resumed visiting Ms. Coger, Ms. Coger recalled Defendant saying he intended to kill Jerry Talbert, he was going to cut his throat and shoot him. (TI 164, 188). Every time she saw Defendant, "almost all day long" Defendant talked about killing Jerry Talbert, in the same manner. Whatever the subject, Defendant eventually returned to talking about Jerry Talbert. (TI 164-165). Defendant told Ms. Coger that his sister and cousin, Rachel Talbert and Cathy Anderson, were helping him. (TI 165). Defendant never indicated that anyone besides these three people were involved in the murder. (TI 166). Rachel Talbert and Cathy Anderson were present when Defendant told Ms. Coger they were involved. They also made comments in this regard. (TI 166, 180).

Rachel Talbert and Cathy Anderson made statements that Defendant was going to pay for what he did to Ms. Talbert's daughter, they wanted Jerry Talbert to die. (TI 180). These statements began in September, and continued almost daily until November. (TI 180-181). At first, Ms. Coger did not take the comments seriously. However, as time went on, and as they discussed it in more detail, Ms. Coger stated that it was more and more creepy. They talked about how they were going to kill Mr. Talbert; they were going to cut his throat and shoot him. All three people, Defendant, Ms. Talbert, and Ms. Anderson, discussed this in each other's presence. (TI 181). The three said they were going to do it together. (TI 181). Defendant also talked about getting the deeds to Jerry Talbert's two homes and his car. (TI 167).

Ms. Coger's husband and his brother, Albert Coger, were also present during some of the time the statements were being made by Defendant, Ms. Anderson, and Ms. Talbert. (TI 191). Ms. Coger reported the threats to the police. (TI 190). During the month of October, Ms. Coger saw Jerry Talbert almost daily. She went to his home. (TI 182). Jerry Talbert was "an elderly man. . .over 70, bent over, real skinny, frail, and he walked with a walker." (TI 183). Ms. Coger did not see Defendant, Rachel Talbert, or Cathy Anderson after November. (TI 182).

Carl Anderson, Defendant's cousin, testified that in December of 2002, he attended a parenting class at Family and Children's Services. (TI 195). Mr. Anderson saw Defendant outside in the parking lot, in Catherine Anderson's (Carl Anderson's sister) car. Defendant held a pistol in his hand, which Carl Anderson noticed after talking to Defendant for a while. (TI 196-197). Carl Anderson told Defendant, who then was smoking a cigarette by Mr. Anderson's car, not to get in any trouble with the gun. Defendant replied he had to take care of some business. (TI 198, 201, 203). Mr. Anderson testified the gun shown to him, (PX 12), looked similar to the gun Defendant had, (TI 198); and that this occurred before Jerry Talbert was reported

4

dead. (TI 204).

Gordon Bundy lived next door to Jerry Talbert. (TI 215-216). Mr. Bundy knew Rachel Talbert, Catherine Anderson, and Defendant since they were at Jerry Talbert's "quite a lot." (TI 216). On Sunday, December 15, 2002, Mr. Bundy saw Defendant, Rachel Talbert, and Catherine Anderson walking dogs in front of his house. It was just after noon. (TI 217). They headed toward Jerry Talbert's house. Mr. Bundy never saw them leave, and in fact, never saw them again. (TI 218).

Early Monday morning, at about 2:30 a.m., Mr. Bundy got up to get a drink of water. He looked out the kitchen window and saw a car at Jerry Ta1bert's house. He saw someone with a lighter in the car. Mr. Bundy looked at the car for a few minutes because he could not figure out why it was there. (TI 219-220). Mr. Bundy went to the bathroom, and when he came out, the car was gone. (TI 221). Later the same morning of the 16th, Mr. Bundy left the house at about 8:00 a.m., to take his grandchild to school. When he returned about twenty minutes later, Mr. Bundy saw police cars next door. (TI 218).

James Kaiser worked at the 911 or dispatch center. (TII 30). Mr. Kaiser took the 911 call from Catherine Anderson on December 16, 2002. (TII 31; PX 16, 34). Mr. Kaiser dispatched units to 318 Parrish after the call. (TII 34).

Officer Rivera was dispatched to that location to investigate a possible breaking and entering. When he arrived, Officer Rivera encountered Catherine Anderson and Rachel Talbert, sitting in their car on the driveway, who told him that they suspected the house was broken in to. Officer Rivera waited for back-up. (TII 37). While waiting, the women told Officer Rivera they worked all night, came home to find the doors unlocked and called 911, saying they did not enter the house. Officer Rivera asked if there was someone who could verify they were at work all night; they said they did not know off hand, but could find someone. (TII 38, 46-47). When back-up arrived, Officer Rivera entered the house.

The door was open, with no sign of forced entry. Officer Rivera opened the door, saw a body laying on the floor. He backed out, called for a supervisor and began to secure the area. (TII 39). In the living room, Jerry Talbert lay on the floor, his walker on top of him, in a large pool of blood. (TIII 4-5). After securing the house, ensuring there were no other victims or suspects in the house, Officer Rivera went outside, removed his hat, and told the women that their father-in-law had passed away. They showed no emotion and one of the women asked if the death was natural. Officer Rivera responded that he could not answer that question. (TII 45). Jerry Talbert was deceased when LifeCare arrived, the apparent victim of gunshot wounds to his head and lacerations to his neck. (TII 59). He was found near the foyer, in a pool of blood, his walker nearby, with the attached bag. No wallet was found in the bag. (TII 104, 126).

The medical director of Forensic Pathology at Sparrow Hospital, an expert in forensic pathology, conducted the autopsy on Jerry Talbert who was 5' 8" tall and weighed 145 pounds. (TIV 5, 13). There was a gunshot wound to the head, on the right side of the forehead, indicating the victim was shot from a distance of less than six inches away. (TIV 6, 8). The bullet passed through the brain, about half-way in.

5

The bullet and some fragments were removed and turned over to law enforcement. (TIV 9). There was some bruising and scraping on the head and nose. (TIV 9). There were bruises between the victim's shoulder and elbow on the left arm, some abrasions on the right elbow, and some lesions on the knee that appeared to be burns, possibly from the end of the barrel of the gun, after it was fired. (TIV 12-13, 22).

There was extensive cutting on the victim's neck, at least three separate cuts (TIV 21), extending from side to side. One cut was about 12 centimeters long, another was actually made by two cuts, about 18 centimeters (approx. 6 inches), which had an extension (the 18 centimeter cut was described as a "Y") of 4½ centimeters as well. This wound "cut through the soft tissues but also cut the external jugular vein, on the left side." (TIV 10, 20). In light of these injuries, the forensic pathologist determined the cause of death was gunshot wound to the head and sharp force neck injury. Both were lethal injuries. (TIV 14).

Rachel Talbert and Catherine Anderson were at the scene, standing outside on the driveway when Detective Wise arrived. (TII 17). Det. Wise interviewed Ms. Anderson at the police department. (TII 17). Ms. Anderson told Det. Wise that she lived at 318 Parish, Jerry Talbert's home. Ms. Anderson further stated that she and Rachel Talbert worked the night before (the murder) as custodians, until approximately 10:00 or 10:30 p.m., then went to a friend's house, Carl Leefert's house, to party until the next morning at about 8:00 a.m. when they returned home to discover the door unlocked, became alarmed, and called the police. (TII 18-19). After speaking with her more, Det. Wise and Detective Sergeant Walters took Ms. Anderson to the parking lot of Denny's to recover a knife from the dumpster. (TII 19). Ms. Anderson pointed to the dumpster but stayed in the car. (TII 20).

The parties stipulated that neither Rachel Talbert nor Catherine Anderson worked for Maintenance Master. Rachel Talbert did work for a temporary service utilized by Maintenance Master, but she only worked on four occasions, and not on the night of the murder as she claimed. (TII 57-58). It was also stipulated that Carl Leefert and Sandra Miller denied that there was a party at their house that night, or that Catherine Anderson or Rachel Talbert were there that evening. They further stipulated that Leefert and Miller had not seen Anderson, Talbert, or Defendant for days. (TII 58).

Elaina Burbank, fourteen years old, walked to the bus stop for school. She saw "Rachel and the other girl" on December 16, 2002. She knew Rachel Talbert and Catherine Anderson because they lived with Jerry Talbert, a good acquaintance of Elaina's family. Elaina left the house ever[y] morning at exactly 6:59, watching the clock for that time to make her bus at 7:07. (TII 60-63). Elaina saw Rachel Talbert and Anderson in Alice Talbert's car, parked between her bus stop and Parrish. As she walked to the bus stop, Elaina saw Catherine Anderson outside the car, "squatted down in position" in the field, then walk back to the car. Elaina saw the car drive away. (TII 62-64).

Detective Robert Drewry, the lead investigator, observed the interview of Catherine Anderson, and conducted part of the interview of Rachel Talbert. (TIV 52). Det. Drewry collected approximately $150.00 from Rachel Talbert, and a motel

room key. (TIV 53). During his investigation, Defendant's name came up, but the detective was unable to find him. Detective Drewry informed the county jail to notify him if Defendant was brought there. On December 18 Defendant was at the county jail where he was interviewed after turning himself in. The recorded interview was played for the jury. (TIV 56, 58, 65; PX 2).

In this statement, Defendant told Det. Drewry that Catherine Anderson came to him and told him she wanted Defendant to kill Jerry Talbert. The day of the murder, Rachel Talbert went to Defendant and told him she wanted it done that night. Defendant told her, "no problem." Defendant also told Det. Drewry he shot Jerry Talbert in the head, while he held the gun to the victim's head, Rachel Talbert poked her head out of the bedroom door to see if Defendant had done it yet, Defendant shook his head no, so she went back in the room with Catherine Anderson. Defendant came back and saw the victim was still alive, and "sliced" his throat. (TIV 67-68; PX 2). Defendant then took money from the victim's wallet. Defendant gave Rachel Talbert $150.00 and kept the rest of the money. (PX 2; TIV 61, 62). Defendant talked about making the murder look like a "mixed up robbery" and that he told Rachel Talbert to call the police and make it look like a break-in. (PX 2).

Detective Lavern Brann investigates violent crimes. He was called to assist in the investigation of Jerry Talbert's death. While Det. Brann observed the interview of Catherine Anderson, he learned that evidence might be located at a local Denny's restaurant. (TI 224). Det. Brann went to the dumpster, looking for a styrofoam package containing a knife. He reached in the dumpster and pulled out the only bag that was there. Inside the plastic bag were two "to go" boxes. After calling an evidence technician, Sergeant Martin Brown, the box was opened to reveal a knife, gloves, and ammunition. (TI 226-227, TII 132; PX 4L).

Next to the dumpster, was a motel. A search warrant was executed at this location. (TI 228). Det. Brann spoke to the motel manager, and secured the registration form for the room in question. (TI 229; PX 17).

Detective Maria Alonso assisted with the interview of Rachel Talbert at the police station. (TII 24). Rachel Talbert repeated the story that Ms. Anderson recited to the detectives about cleaning, then going to a party until the next morning because she was too drunk to drive home. (TII 25). Ms. Talbert also said that she and Ms. Anderson called 911 as soon as they discovered Jerry Talbert's door was unlocked and they did not proceed in to the house. (TII 26). Det. Alonso did not detect alcohol on Ms. Talbert, nor did she detect the level of intoxication that Ms. Talbert described. (TII 26-27). Ms. Talbert directed detectives to a location to search for a gun. (TII 28).

Joel Shepperly, laboratory specialist, went to Motel 6, the room where the suspects apparently stayed, and collected items for examination. (TII 71-74). He also went to Rook Street to collect a handgun. (TII 71-74). Officers had been informed that a gun used from a homicide that morning had possibly been thrown in the woods nearby. (TII 114). Defendant's black jacket and shoes were submitted for testing. His clothes were not because Defendant informed officers he already disposed of the

7

clothes he was wearing. (TII 157).

Forensic technician Jennifer Diepenhorst collected a wallet from Mr. Hart, she did not recall there being any money in the wallet. (TII 88). Phil Hart, Alice Hart's (victim's niece) husband, went with his wife to Jerry Talbert's home the day after the murder discovery, to determine if anything was missing. (TII 121). Alice Hart found Jerry Talbert's wallet, empty. (TII 122). A police sergeant inspected the wallet at the scene, found in the victim's pants that were by the bed. The wallet was empty at that time. (TII 129).

An expert in firearms and tool marks from MSP was asked to determine if the fired bullet was fired from the handgun submitted to him. (TIV 27). The expert confirmed that the retrieved bullet could have been, but was unable to say with certainty that it actually had been, fired from that particular gun, given the condition of the bullet which was mutilated and "mushroomed" which happens to a bullet after hitting bone. (TIV 30).

Kathy Fox, forensic scientist in the Biology Unit at the MSP crime lab was qualified as an expert in biology and DNA analysis. (TIII 15-16). The knife blade tested positive for human blood. (TIII 20). The left glove also tested positive for human blood. (TIII 21). The evidence was turned over to Anne Chamberlain-Gordon for DNA analysis. (TIII 24).

Gordon was also qualified in biology and DNA analysis. (TIII 50-51). Biological samples were taken from Rachel Talbert, Jerry Talbert, Defendant, and Catherine Anderson. (TIII 52). The knife handle sample and the sample from the knife blade matched the DNA samples taken from the victim, Jerry Talbert. (TIII 55-56). Ms. Gordon did not find DNA on the samples taken from the hand grip of the handgun. (TIII 57). The left glove sample results from the outside palm area matched the victim's DNA sample. The left glove sample from the inside palm area revealed a mixed sample of DNA. Catherine Anderson and Rachel Talbert were excluded as possible donors to the mixed sample, while Defendant and the victim could not be excluded as donors. In other words, at each of the DNA loci tested, their individual DNA types were present. (TIII 58-59). A statistical analysis for mixed samples was conducted, which found that if one were to randomly test members of the Caucasian population, there was only a 1 in 1.1 million chance of creating the combination found in the blood sample taken from inside the glove, (TIII 60, 64); this was a conservative estimate. (TIII 71-72).

Defendant testified that December 15th, in to the morning hours of the 16th he watched movies, drinking, playing video games, at a friend's house on Euclid Avenue. (TV 7-8). Defendant stated that Rachel Talbert and Catherine Anderson came to the Euclid address, after tracking him down. (TV 8, 28). Defendant reported Rachel Talbert told him she wanted to talk to him somewhere safe, so she went to the Motel 6. Defendant rented the room. (TV 9). Defendant testified that Rachel and Catherine started telling him details about the murder they just committed. Defendant reported Rachel and Catherine left, while he remained at the motel. (TV 10). They took the gun and knife with them and when they came back, Defendant said Rachel and Catherine did not say anything, and went to sleep. Defendant said Rachel and

Catherine woke up the next morning, went back to where Defendant said they committed the murder themselves, and then called the police from the victim's house. (TV 11).

Defendant testified he left the motel and walked all the way from the motel to downtown Battle Creek. (TV 12-13). Defendant called his sister who told him she was being questioned. (TV 13). Defendant then said he went to Carl Leefert's house; and after learning that, "they're saying that [he] was the one that was involved with the crime. . .that they committed; Rachel Talbert and Catherine Anderson, and that scared [him] because [he] was not involved," so Defendant said he left the state. (TV 14). Defendant testified he told Det. Drewry he killed Jerry Talbert because he was thinking of his sister and Catherine Anderson; though when asked if he had a close relationship with his sister, Defendant said, "not really" (TV 14, 9), but at trial he denied the killing and blamed Rachel Talbert and Catherine Anderson. (TV 15). Defendant said that a few weeks after he was charged in this case, he decided he wanted a family; and he thus changed his mind about taking the blame for the murder. (TV 34).

When asked about showing his gun to Carl Anderson and making the comment that he had business to take care of with it, Defendant testified he meant to sell the gun and thought Carl Anderson might want to buy it. (TV 16). Defendant admitted he did not talk to Anderson about selling the gun. (TV 17). Defendant also agreed this incident was a few days before the murder. (TV 17). Defendant also testified he turned himself in on a driving while license suspended warrant, and that it had nothing to do with the murder. (TV 20). Defendant said it was at this time, when turning himself in for a DWLS, that he decided to take the blame for the murder. (TV 21). Defendant denied ever telling anyone that he wanted to kill Jerry Talbert. He denied ever saying that to Lois Coger. (TV 26).

Appellee's Br. on Appeal, in *People v. Lord*, No. 252847 (Mich. Ct. App.), at 1-11.

C.  *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the

Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529 U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

D.  *Sufficiency of the Evidence (Claim I)*

Petitioner first asserts that the evidence was constitutionally insufficient to sustain his conviction beyond a reasonable doubt. The Court should conclude that petitioner is not entitled to relief on this claim.

1.  *Clearly Established Law*

The Due Process Clause of the Fourteenth Amendment "protects the accused against

11

conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970). Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution. *See Neal v. Morris*, 972 F.2d 675, 678 (6th Cir. 1992). In determining the sufficiency of the evidence, the court must give circumstantial evidence the same weight as direct evidence. *See United States v. Farley*, 2 F.3d 645, 650 (6th Cir. 1993).

However, under the amended version of § 2254(d)(1) a federal habeas court must apply a more deferential standard of review of the state court decision. Thus, the question here is whether the Michigan Court of Appeals's application of the *Jackson* standard was reasonable. *See Gomez v. Acevedo*, 106 F.3d 192, 198-200 (7th Cir. 1997), *vacated on other grounds sub nom. Gomez v. DeTella*, 522 U.S. 801 (1998); *Restrepo v. DiPaolo*, 1 F.Supp.2d 103, 106 (D. Mass 1998).

While a challenge to the sufficiency of the evidence on an established element of an offense raises a federal constitutional claim cognizable in a habeas corpus proceeding, "[t]he applicability of the reasonable doubt standard ... has always been dependent on how a State defines the offense that is charged in any given case." *Patterson v. New York*, 432 U.S. 197, 211 n.12 (1977); *see also*, *Jackson*, 443 U.S. at 324 n.16; *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975). Thus, "[a] federal court must look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

12

2. *Analysis*

Petitioner was convicted of both felony murder and conspiracy to commit murder. However, petitioner contends that there was insufficient evidence to support only his conspiracy to murder conviction.[1] The Michigan Court of Appeals rejected this claim, applying the *Jackson* standard and reasoning that in the light most favorable to the prosecution, the evidence was sufficient to allow a rational trier of fact to determine that defendant conspired with Rachel Talbert and Catherine Anderson to murder the victim. *See Lord*, 2005 WL 1632533, at *1-2. The Court should conclude that this determination was reasonable.

Under 28 U.S.C. § 2254(d)(1), the state court's conclusion that the evidence was sufficient to support petitioner's conspiracy conviction must amount to a reasonable application of the test to the facts presented. *Gomez*, 106 F.3d 192, 200 (7th Cir. 1997). In petitioner's case, the evidence, when viewed in the light most favorable to the prosecution, was sufficient to establish petitioner's guilt on the charge of conspiracy to murder the victim beyond a reasonable doubt. The prosecution presented evidence that petitioner, along with coconspirators Rachel Talbert and Catherine

---

[1] Under the "Concurrent Sentencing Doctrine," a "court may decline to hear a substantive challenge to a conviction when the sentence on the challenged conviction is being served concurrently with an equal or longer sentence on a valid conviction." *Dale v. Haberlin*, 878 F.2d 930, 935 n.3 (6th Cir. 1989); *see also*, *United States v. Hughes*, 964 F.2d 536, 541 (6th Cir. 1992). The doctrine is a discretionary one, *see Hughes*, 964 F.2d at 541, and courts "are admittedly hesitant to apply this doctrine." *Dale*, 878 F.2d at 935 n.3. The doctrine is applicable only "when there is *no possibility* of adverse 'collateral consequences' if the convictions stand." *Id*. (emphasis added).

Here, it cannot be said that there is *no* possibility of adverse consequences. There is a possibility, however slight, that petitioner's first degree murder conviction not challenged here will no longer result in his imprisonment. For example, although unlikely, the governor may commute his sentence or pardon him. *See* MICH. CONST. Art. V, § 14 (1963). Similarly, the conviction may be overturned in state postconviction proceedings, or by a federal court through a writ of habeas corpus.

Anderson, believed the victim had molested petitioner's niece and constantly talked about killing the victim by slitting his throat. Further, there was testimony from petitioner's cousin that petitioner showed him a pistol and told him that "he had to go take care of some business." In addition, Catherine Anderson led police to a dumpster where the knife was recovered, and Rachel Talbert informed police where to find the gun. From this evidence, a reasonable juror could conclude beyond a reasonable doubt that petitioner conspired to murder the victim. *See Cameron v. Birkett*, 348 F. Supp. 2d 825, 840 (E.D. Mich 2004) (Gadola, J., adopting recommendation of Komives, M.J.). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

E. *Admission of Coconspirator Statements (Claim II)*

Petitioner next contends that he was denied a fair trial by the prosecutor's repeated introduction, over objection, of hearsay statements of coconspirators Rachel Talbert and Catherine Anderson. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1. *Clearly Established Law*

It is well established that habeas corpus is not available to remedy a state court's error in the application of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we reemphasize that it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); *Jackson v. Ylst*, 921 F.2d 882, 885 (9th Cir. 1990) (a federal court on habeas review "ha[s] no authority to review a state's application of its own laws). Thus, unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional magnitude. *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir.

1987). "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law. State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution." *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993). As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial." *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994).

In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy." *Acevedo*, 169 F.3d at 1163; *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001). Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable and ... the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

2. *Analysis*

Petitioner contends that the evidence was insufficient to convict him of conspiracy to commit first-degree premeditated murder because the trial court erred in finding independent evidence absent the statements of coconspirators that petitioner conspired to murder the victim. Such independent evidence must precede the introduction of coconspirators' statements. Thus, petitioner argues, he is entitled to a new trial. The Michigan Court of Appeals rejected this claim, reasoning that viewed in a light most favorable to the prosecution, circumstances independent of statements

made by coconspirators existed to permit the admission of this otherwise hearsay testimony. *See Lord*, 2005 WL 1632533, at *1. The Court should conclude that this determination was reasonable.

Under Michigan law, statements of a coconspirator may be admitted as an exception to the hearsay rule if circumstances, acts, and conduct of the parties independent of the statements of the coconspirators establish an agreement to commit some unlawful act. *See* MICH. R. EVID. 801(d)(2)(E); *People v. Gay*, 149 Mich. 468, 471, 386 N.W.2d 556, 557 (1986). Here, such independent evidence exists and petitioner therefore has failed to demonstrate that he was denied a fair trial by the introduction of coconspirators' testimony.

As the Michigan Court of Appeals found, the coconspirators' testimony from both before the victim was found and afterwards to the police was admissible pursuant to Rule 801(d)(2)(E). Petitioner has offered nothing to show that the court of appeals's determination on these evidentiary issues was unreasonable in light of the circumstances surrounding the coconspirators' statements. There was evidence that petitioner openly plotted the victim's murder with Rachel Talbert and Catherine Anderson in the exact way that the murder occurred–by slitting the victim's throat. Petitioner's cousin also testified that petitioner showed him a gun and said that "he had to go take care of some business." In addition, Catherine Anderson led police to a dumpster where the knife was found, and Rachel Talbert informed police of where to find the gun. Furthermore, the coconspirators' statements made after the murder was actually committed were admissible because the conspiracy was still in progress by the coconspirators' attempt to make the murder look like a random breaking and entering. *See People v. Bushard*, 444 Mich. 384, 396, 508 N.W.2d 745, 746 (1993). Because he cannot show that the court of appeals's evidentiary ruling was unreasonable,

petitioner cannot demonstrate that he was denied a fair trial by the proper admission of this evidence under Rule 801(d)(2)(E). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.  *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically,

and in the same order raised, each issue contained within the objections.

                                              s/Paul J. Komives
                                              PAUL J. KOMIVES
                                              UNITED STATES MAGISTRATE JUDGE

Dated: 8/27/07

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on August 27, 2007.
>
>                            s/Eddrey Butts
>                            Case Manager